IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re ) | FILED |
| ) | 3:23 pm, 4/5/12 |
| JAMES ROBERT ZEIGAFUSE and ) Case No. 11-20854 | Tim J. Ellis |
| DEBRA ANNE ZEIGAFUSE, ) Chapter 13 | Clerk of Court |
| ) | |
| Debtor. ) | |

### OPINION ON DENYING CONFIRMATION OF THE DEBTORS' CHAPTER 13 PLAN DATED AUGUST 15, 2011

On December 21, 2011, this matter came before the court for an evidentiary hearing on the confirmation of the Chapter 13 Plan dated August 15, 2011 ("Plan") and the Trustee's objection. The matter was continued several times and reconvened on March 21, 2012. The parties were represented as stated on the record. The court having reviewed the record, testimony and evidence finds that confirmation of the Plan is denied.

**Jurisdiction**

This court has jurisdiction of this matter under 28 U.S.C. §§1334(a) and 157(a). This is a core proceeding under 28 U.S.C. §157(L). This plan is before the court for confirmation under 11 U.S.C. §1301 *et seq*.[1]

**Facts**

James and Debra Zeigafuse ("Debtors") filed their chapter 13 bankruptcy petition on August 1, 2011. The Debtors filed their Plan, Chapter 13 Statement of Current

---

[1] Unless otherwise indicated, all future statutory reference are to the Bankruptcy Code, Title 11 of the United States Code.

Monthly and Disposable Income ("Form 22C") and other required schedules and documents on August 15, 2011. The Debtors calculate their income on Form 22C to reflect that they are below-median income debtors. Therefore, they assert that their net disposable income to be paid into the plan is calculated from their Schedules I and J. The Trustee filed his objection on September 26, 2011.

Mr. Zeigafuse is employed by Transam Trucking as a long-haul truck driver. Mrs. Zeigafuse is a licensed practical nurse. The Debtors live in a mobile home located in the Riverside Mobile Home Park in Casper, Wyoming. The Debtors are purchasing the mobile home by a contract for deed with the last payment due in April, 2012. The space in which the mobile home is located is rented on a month-to-month basis. Mrs. Zeigafuse testified that she does not like the [trailer] park where they currently live as she does not "feel safe there."

Additionally, the Debtors, their son and daughter-in-law, entered into an agreement to purchase 50 acres of undeveloped property near Casper in May, 2009, again by a contract for deed. The total monthly payment is $653.02, which is split between the Debtors and their son and daughter-in-law. Mrs. Zeigafuse testified that their portion of the land payment is $425.00 a month. In addition, the Debtors paid $160.00 a year in homeowners' fees. These fees have risen to $225.00 to $250.00 a year for 2012. Mrs. Zeigafuse's testimony was conflicting on whether the Debtors pay all or part of the homeowners' fees. On December 21, 2011, she testified that the Debtors paid

all the homeowners' fees. However, on March 21, 2011, she testified that the Debtors pay one-half of the fees.

The Debtors purchased the 50 acres with the hopes of developing the property by having electricity, water and sewer installed, purchasing a mobile home and moving onto the property to live. Mrs. Zeigafuse testified that the estimated costs to improve the property would include: extending electrical service: $3,000.00; drilling a well at a cost between $22,500.00 and $37,500.00 [although she testified that the Debtors would potentially haul water at first]; and, sewer installation that would be for "costs only" as their son would do the work. These expenses do not include the costs of purchasing a mobile home. The Debtors expect that the expenses for installation of the services would be split with their son and daughter-in-law.

The Debtors also claim out-of-pocket medical expenses in the amount of $575.00 per month, which includes their insurance deductibles, Debtors' uninsured medical expenses, including equipment, prescriptions, other medications, and vision expenses. Both Debtors have chronic medical conditions.

Mrs. Zeigafuse testified that she has a student loan in the amount of $56,570.00 on which she pays $320.00 a month that the Debtors claim as a monthly expense and deduct from their net income on Schedule J for the purpose of calculating their disposable income.

**Discussion**

The Trustee objects to confirmation of the plan, alleging that the Debtors do not propose to apply all of their projected monthly disposable income to pay their non-priority unsecured creditors.[2] Specifically, the Trustee asserts that: (1) Debtors are in fact above-median income debtors as Mr. Zeigafuse's income is understated; (2) Debtors claim the following expenses that are not reasonable and necessary for the support and maintenance of the Debtors, who have no dependents: (A) the monthly payment for the purchase of the 50 acres and the annual homeowners' fees; and (B) the monthly expenses for uninsured medical expenses in the amount of $575.00; and, (3) Debtors' Plan unfairly discriminates against their non-priority, unsecured creditors as Debtors propose to pay Mrs. Zeigafuse's student loan its full monthly payment while providing a 1.2 percent distribution from a total fund of $1,620.00 to the balance of their unsecured creditors' claims.

If the trustee objects to confirmation of the plan, the court may not approve the plan unless, as of the effective date of the plan, the plan provides that all the debtor's projected disposable income to be received during the term of the plan will be applied to make payments to unsecured creditors under the plan.[3] The debtors have the burden of establishing that their plan is confirmable and that the proposed classification does not discriminate unfairly.[4]

---

[2] 11 U.S.C. 1325 (b)(1)(B).

[3] 11 U.S.C. §1325(b)(1).

[4]*In re Janssen,* 220 B.R. 639, 643 (Bankr. N.D. Iowa 1998).

Page 4

(1)    Income

The Debtors assert that Mr. Zeigafuse's monthly income is $74.28 per month from the operation of his business of driving truck.[5] Mr. Zeigafuse testified to the numerous expenses that are deducted from his weekly settlement sheets, including: truck lease payments, advances, insurance, fuel, etc. The Debtors' income tax return reflects that Mr. Zeigafuse earned $4,446.00 "net profit" for the 2010 tax year based upon a total gross receipt of $160,770.00. The tax return included the expenses that Mr. Zeigafuse testified about and were reflected on the settlement sheets but also included the additional deductions for meals, travel, and depreciation. Mr. Zeigafuse's total gross receipts for 2011, as indicated on his 1099 tax form, show that his receipts increased in 2011 to the amount of $166,574.15. It appears to the court, that Mr. Zeigafuse's receipts increased nearly $6,000.00. However, Mr. Zeigafuse alleges that he expects to realize less net income in 2011, based upon higher fuel costs.

The court finds that Mr. Zeigafuse's income is difficult to determine but the assertion of $74.28 a month is an undervaluation. Based upon an average of his net profit for 2010, his income is closer to $370.50 a month.[6] Based upon that determination, the court's calculation indicates that using the correct income for Mr. Zeigafuse, the Debtors are not below median income debtors and must complete Form 22C to determine their projected disposable income.

---

[5] Pursuant to Debtors' Form 22C.

[6] The court divided Mr. Zeigafuse's net income from the 2010 tax return by 12 months to arrive at this amount. The court does not find that the pay advices reflect an accurate income as the debtor had advances, paid back advances and other factors on the pay advices that skew his average monthly income.

Page 5

(2)    Expenses

(A)    <u>50 Acres and Homeowners' Fees.</u>  Under their proposed plan, the Debtors will emerge from the chapter 13 case having continued the payments on the undeveloped land and payment of the homeowners' fees. They would still have no equity in the property; not developed it; nor moved onto the property. As much as the court appreciates the Debtors' dreams of developing and eventually moving onto the property, these are not reasonable or necessary expenses for the maintenance of this family and effectively reduce the Debtors' disposable income that should be contributed to their unsecured creditors through their plan. The expenses are not a permissible basic living expenses.

(B)    <u>Uninsured medical expenses</u>. Mrs. Zeigafuse testified to the costs of the Debtors' uninsured medical expenses. Both Debtors have chronic medical issues. Based upon the testimony and evidence, the court finds that the expenses are reasonable and necessary basic living expenses for these Debtors.

(C)    <u>Unsecured student loan payment</u>. Debtors argue that under §1322(b)(5) long term debt can be treated differently than short term debt and that the discrimination is allowable. The Trustee asserts that payment of the student loan "outside the plan" unfairly discriminates under §1322(b)(1).

The courts are divided upon this issue. This court's review of the numerous cases regarding that the applicable statutory sections which are referenced under §1322, state:

"Subject to subsections (a) and (c)...the plan may,

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated...;

(5) provide for...maintenance of payments while the case is pending on any unsecured claim...on which the last payment is due after the date on which the final payment under the plan is due;

(10) provide for the payment of interest accruing after the date of filing of the petition on unsecured claims that are nondischargeable under 1328(a), except that such interest may be paid only to the extent that the debtor has disposable income available to pay such interest after making provisions for full payment of all allowed claims..."

The courts holding the minority view find that §1322(b)(5) is specific and clear in its language and that the statutory construction principle that dictates that the specific language trumps the general terms supports the contention that (b)(5) trumps the more general terms of (b)(1).

The minority view courts also have adopted numerous tests for the determination of whether the discrimination is unfair. One test is the four part *Leser* test in which courts consider: (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination.[7] Other minority courts have adopted a five-part test known as the *Husted* test. This is the *Leser* test, but includes the additional fifth

---

[7] *In re Leser*, 939 F.2d 669, 672 (8th Cir. 1991), cited in *In re Birts*, Case No. 11-15918, 2012 Bankr. LEXIS 727, (E.D. VA, Feb. 27, 2012).

factor: "whether the difference between what the creditors discriminated against will receive as the plan is proposed, and the amount they would receive if there were no separate classification."[8] The Bankruptcy Court for the Easter District of Virginia adopted a variation of the *Husted* and *Leser* tests by using the *Leser* first three factors and substituting the *Husted*'s fifth element in place of *Leser's* number four.[9]

The courts holding a majority view find that the statutory sections of the Bankruptcy Code, §§ 1322 (b)(1) and (5) are to be read in conjunction with each other; and that unfair discrimination must be analyzed on a case by case basis.

The Bankruptcy Court for the District of Kansas ("Kansas Bankruptcy Court") analyzed the matter, in depth.[10] The Kansas Bankruptcy Court described the different tests that have emerged from the case law for determining whether a separate classification and treatment of student loans unfairly discriminates against the class of general unsecured claims. First, the court lists the "four step test" applied by *Leser*, above. Secondly, the court describes the "balancing test" which involves balancing the relative benefits and detriments allocated to the debtor and creditors from the proposed discrimination.[11] According to the test, the comparisons of the benefits and detriments must be made in light of the legitimate interests and expectations of the parties-in-interest

---

[8] *In re Husted*, 142 B.R. 72, 74 (Bankr. W.D.N.Y. 1992).

[9] *Birtz* at 8.

[10] *In re Mason*, 300 B.R. 379 (Bankr. D. Kan. 2003).

[11] *In re Colfer*, 159 B.R. 602 (Bankr. D. Me. 1993).

Case 11-20854 Doc 62 Filed 04/05/12 Entered 04/05/12 15:37:14 Desc Main
Document Page 9 of 14

in the Chapter 13 proceeding. Third, the Kansas Bankruptcy Court discussed the "baseline test" described by the First Circuit Bankruptcy Appellate Panel.[12] In the "baseline test," the court reviews the four guiding principles of chapter 13 for what is the norm, or the "baseline" from which departures can be evaluated for fairness, including: (i) equality of distribution; (ii) nonpriority of student loans; (iii) mandatory vs. optional contributions; and, (iv) the debtor's fresh start. Lastly, the Kansas Bankruptcy Court lists the "Debtor's Interest test" which focuses on whether the discrimination furthered a legitimate interest of the debtor.

**Application of the tests to the facts before this court.**

In the case before this court, the unsecured student loan obligation consists of the claim of Nelnet in the amount of $55,784.21.[13] The amount of general unsecured claims, exclusive of the student loan claim, totals $14,004.76.[14] If the Debtors make all the payments proposed in the Plan and the student loan payment during the term of the plan, the total distribution to Nelnet will be $11,520.00, or 21 percent of the total amount of the student loan claim. The Debtors' plan proposes to pay the balance of their non-priority, unsecured claims pro rata from the total sum of $1,620.00 or a distribution of approximately 1.2 percent. If the student loan claim is paid pro rata with the other

---

[12] *In re Bentley*, 266 B.R. 229 (1st Cir. BAP 2001).

[13] Claim No. 2 - Debtors' claims register.

[14] The court calculated this number by subtracting Nelnet's claim from the total amount of general unsecured claims pursuant to the Claims Register Summary. Debtors listed a total amount of unsecured nonpriority claims on their Schedule F in the amount of $134,184.97.

general unsecured claims, all the unsecured creditors would receive a dividend of approximately 19 percent.[15] Under either situation, the student loan claim would not be paid in full at the completion of the Plan.

  a. <u>Statutory application argument.</u> The Debtors urge the court to adopt the minority view that the more specific and clear language of the statute trumps the general language.[16] The Debtors argue that the language in §1322(b)(5) that provides "for the maintenance of payments while the case is pending on any unsecured claim on which the last payment is due after the date on which the final payments under the plan is due," is more specific than the language of §1322(b)(1), and allows the unsecured student loan debt to be paid "outside the plan." This court is not persuaded by the Debtors' argument and joins the majority view holding that §§1322(b)(1) and 1322(b)(5) must be read in conjunction with one another.[17]

  b. <u>Four-part test.</u> The court finds that the Debtors did not provide any testimony or evidence to show a reasonable basis for the discrimination between their unsecured creditors, other than argue that the court should consider the "human element" and what was best for the Debtors. Debtors did not present evidence whether they could

---

[15] This does not take into account that the student loan is also being paid interest during the term of the Plan.

[16] *In re Truss*, 404 B.R. 329 (Bankr. E.D. Wis. 2009), *In re Hanson*, 310 B.R. 131 (Bankr. W.D. Wis 2004), *In re Cox*, 186 B.R. 744 (Bankr. N.D. Fla. 1995), and *In re Benner*, 156 B.R. 631 (Bankr. D. Minn. 1993).

[17] *In re Coonce*, 213 B.R. 344 (Bankr. S.C. Ill. 1997), *In re Harding*, 423 B.R. 568 (Bankr. S.D. Fla. 2010), *In re Chandler*, 210 B.R. 898 (Bankr. D. N.H. 1997); *In re Thibodeau,* 248 B.R. 669 (Bankr. D. Mass. 2000) and *In re Caruso*, 272 B.R. 254 (Bankr. C.D. Ill. 2001).

carry out their plan without the discrimination; if the plan was proposed in good faith; or the degree of discrimination as it related to the rationale for the discrimination. The Debtors failed to meet their burden of proving that the separate classification does not unfairly discriminate against the class of other unsecured creditors under the four-part test. .

    c.    <u>Balancing test</u>. The facts of the case before this court are similar to the facts in *In re Mason*. In that case, the Kansas Bankruptcy Court found that the proposed discrimination provided the student loan creditor priority over other unsecured creditors that is not provided in the Bankruptcy Code while the student loan creditor also retained the right to collect the balance of its obligations after the debtors' discharge was entered. The debtors' other unsecured creditors were not provided any distribution until the end of the plan and the balance of their claims were discharged after the plan payments were completed. In the case before this court, the student loan creditor, Nelnet, is provided a priority over the other unsecured creditors as it receives its full monthly payment and the Debtors other unsecured creditors receive a distribution equal to 1.2 percent of their claims. As in *Mason*, it is clear that the Debtors' burden for the nondischargeable student loan debt has been shifted to the unsecured creditors, unfairly discriminating against them under the balancing test.

    d.    <u>Baseline test</u>. The "baseline test" was adopted by the First Circuit BAP in

Page 11

*In re Bentley.*[18] Subsequently the Kansas Bankruptcy Court described the test as the "most loyal to the objective goals and motivations of Chapter 13 and the Bankruptcy Code," stating the test is:

> "...essentially objective and measurable in that it would require courts to determine (1) whether the preferred debt is accorded statutory priority; (2) whether the unsecured creditors would receive at least as much as they would receive without the debt being preferred; (3) whether the unsecured creditors would receive a fair pro rata share of the debtor's mandatory contribution of disposable income (and if not, whether the debtor has agreed to make an additional contribution to "square up" the unsecured creditors' distribution); and whether the preferential treatment of one creditor somehow furthers the debtor's fresh start."[19]

This court agrees with the Kansas Court's determination that the baseline test is objective, fairly easy to implement and prevents courts from legislating priorities.

Analyzing the facts of the case before the court, (1) it is undisputed that Congress has not provided student loans a statutory priority in the Bankruptcy Code; (2) the calculations reflect that the unsecured creditors under the proposed plan would receive a 1.2 percent distribution, whereas if there was no discrimination, they may receive a 19 percent distribution; (3) Debtors have not proposed any voluntary contribution to "square-up" the disproportionate distribution and (4) there was no evidence presented that the proposed preferential treatment will further the Debtors fresh start as nearly 80 percent of the student loan debt survives the bankruptcy case. The Debtors have failed to

---

[18] *In re Bently*, 266 B.R. 229 (1st Cir. BAP 2001).

[19] *Mason* at 387.

meet their burden that the proposed payment to their unsecured student loan claim does not unfairly discriminate under the baseline test.

**Conclusion**

The court concludes that in applying all the tests, the Debtors failed to meet their burden showing that their Plan does not unfairly discriminate against the class of general unsecured creditors. As stated above, the majority of Debtors' unsecured creditors are unduly burdened for the benefit the holder of the nondischargeable student loan debt, Nelnet. Debtors did not provide testimony or evidence in support of the discrimination, only argued that the court should adopt the statutory construction argument and take into consideration the "human" element of the Debtors' circumstances. This court refuses to adopt the statutory argument and Debtors have failed to meet their burden with any of the other tests. The court finds that the proposed treatment of the student loan claim and unsecured creditors unfairly discriminates. Therefore, the Trustee's objection is sustained.

Based upon the court's analysis, the court finds that this Plan cannot be confirmed and the Trustee's objections to confirmation are sustained on the following issues: (1) the Debtors have understated Mr. Zeigafuse's income, (2) the expenses for the purchase of the 50 acres and homeowner's fees are not reasonable and necessary for the Debtors' maintenance; and, (3) the Plan unfairly discriminates in favor of the student loan creditor, Nelnet, and against the other unsecured creditors in this case. The court would allow the

Debtors the uninsured medical expenses as they carried the burden of proof.

This decision constitutes the court's findings of facts and conclusions of law pursuant to Bankruptcy Rule 7052. The court shall enter a separate order.

DATED this 5 day of April, 2012

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
  Stephen Winship
  Mark Stewart